# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| RICARDO URIBE, Individually, and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>v.<br><br>WOUND TECHNOLOGY NETWORK, INC.,<br><br>               Defendant. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ricardo Uribe, individually and on behalf of all others similarly situated ("Class members"), files this Class Action Complaint against Wound Technology Network, Inc. ("Wound Tech") and alleges as follows based on personal knowledge, the investigation of his counsel, and information and belief.

## I.    INTRODUCTION

1.    Wound Tech treats patients suffering from complex and chronic wounds who face painful, stressful, and medically fragile conditions that significantly diminish quality of life, and provides specialized wound care directly in patients' homes.

2.    The last thing patients dealing with serious medical conditions need is the additional fear, stress, and harm caused by the exposure of their most sensitive and private personal and medical information to cybercriminals.

3.    But that is precisely what occurred in connection with the Wound Tech data breach that became publicly known in or about February 2026 ("Data Breach"). As a result of the Data Breach, approximately 160,000 patients records nationwide containing the highly sensitive personally identifiable information ("PII") and protected health information ("PHI") (collectively, PII and PHI are referred to as "Private Information") of Plaintiff and Class Members were accessed, viewed, and acquired by unauthorized parties. Based on information and belief, Plaintiff is a victim of the Data Breach and brings this action on behalf of himself and all others whose Private Information were compromised as a result of the Data Breach ("Class").

4.    While patients entrusted Wound Tech with their care and most sensitive information, hackers were able to access and exfiltrate vast quantities of patient data stored in Wound Tech's systems. The Data Breach exposed patients to an increased risk of identity theft, medical identity theft, fraud, and emotional distress, and compounded the physical, financial, and psychological burdens already borne by this medically vulnerable population.

5.    The Data Breach occurred when hackers gained access to Wound Tech's cloud-based systems, including improperly secured and/or unencrypted data repositories. Public reporting indicates that attackers claimed to have accessed approximately 3.8 terabytes of data, including patient records, clinical documentation, and images, before the intrusion was discovered.

6.    The Data Breach resulted in the exposure of highly sensitive Private Information, including but not limited to patient names, dates of birth, medical record numbers, Social Security numbers, along with multiple other identifiers and detailed PHI, including referral documents and complete medical records.

7.    According to public reports, the Data Breach included "4,669,307 records documenting the most sensitive medical information imaginable," including approximately "85,000 PDF referral documents with full patient PHI and full medical

records" and approximately "93,000 clinical wound photographs."[1]

8.    Public reports suggest that an analysis of the 4.6 million clinical notes reveals that the Data Breach included 79,695 documented cases of Dementia/Alzheimer's, 45,061 documented cases of Cancer, 17,914 cases documented cases of Depression, 6,720 documented cases of HIV/AIDS, 5,755 documented cases of Substance Abuse/Addiction, 3,258 documented cases of Schizophrenia, and 2,584 documented cases of Bipolar Disorder. These statistics are "not anonymous. Through the EMPI cross-reference system, each of these notes can be connected to a named patient with their date of birth and insurance details."[2]

9.    Wound Tech not only affirmatively shared, disclosed, and provided the hackers with access Plaintiff's and Class members' medical information, but the hackers accessed, copied, and viewed the Private Information as part of the Data Breach. Based on information and belief, additional third parties also viewed these Plaintiff's and Class members' Private Information as part of analyzing the above information.

10.    Many Class members are unaware that Wound Tech maintained extensive repositories of their personal and medical data or that the Data Breach even occurred as it does not appear that Wound Tech has provided notice required by state

---

[1] WoundTech Data Breach Exposes 160,000 Sensitive Patient Records, Hendry Adrian, https://www.hendryadrian.com/woundtech-data-breach-exposes-160000-sensitive-patient-records/ (last visited Feb. 4, 2026).
[2] *Id.*

and federal law.

11.    Upon learning of the Data Breach, Plaintiff was shocked and alarmed to discover that a company he interacted with had retained and failed to adequately safeguard his most sensitive information.

12.    Prior to the Data Breach, Wound Tech affirmatively represented in its online Privacy Policy the following: "Protecting the privacy and security of personal health information maintained, transmitted, or otherwise made available via this Website is vitally important to us. We do so in accordance with applicable data protection laws, including HIPAA. We have implemented appropriate privacy safeguards to prevent unlawful use or disclosure of personal health information. We have also implemented administrative, physical, and technical security safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic personal health information that we receive, maintain or transmit."[3]

13.    Wound Tech provided each of its patients with a copy of a Privacy Policy and other policies and required each patient to sign an acknowledgment of the terms thereof. Wound Tech was otherwise bound by the representations made in these agreements, regardless of whether Plaintiff and/or Class members executed an acknowledgment, by its acceptance of Plaintiff's and Class members' Private Information.

---

[3] Privacy Policy, Wound Tech, https://woundtech.net/privacy-policy/ (last visited Feb. 4, 2026).

4

14.    Contrary to these representations, Wound Tech failed to adequately protect Plaintiff's and Class members' Private Information. Rather than delivering the secure, patient-centered care it promised, Wound Tech's deficient data security practices directly caused ongoing and future harm to Plaintiff and the Class.

15.    Contrary to its promises to help patients improve the quality of their lives, Defendant's conduct has instead been a direct cause of the ongoing harm to Plaintiff and other Class members whose suffering has been magnified by the Data Breach, and who will continue to experience harm and data insecurity for the indefinite future.

16.    Specifically, Defendant failed to maintain reasonable and/or adequate security measures to protect Plaintiff's and other Class members' Private Information from unauthorized access and disclosure, apparently lacking, at a minimum: (1) reasonable and adequate security measures designed to prevent this attack even though Defendant knew or should have known that it was a prized target for hackers; and (2) reasonable and adequate security protocols to promptly detect the unauthorized intrusion into and removal of Private Information from its network pertaining to more than 160,000 patients.

17.    Hackers can sell the Private Information to other unauthorized users or misuse themselves to commit a variety of crimes that harm Plaintiff and Class members. For instance, they can take out loans, mortgage property, open financial accounts, and open credit cards in a victim's name; use a victim's information to obtain government

benefits or file fraudulent returns to obtain a tax refund; obtain a driver's license or identification card in a victim's name; gain employment in another person's name; give false information to police during an arrest; or engage in medical fraud that can result in financial harm or a harmful misdiagnosis to Plaintiff and Class members.

18.    As a result of Defendant's willful failure to prevent the Data Breach, Plaintiff and Class members are more susceptible to identity theft, fraud, and other harm, and have experienced, will continue to experience, and face an increased risk of financial harms.

19.    Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class members' Private Information that Defendant collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

20.    Plaintiff seeks remedies including, but not limited to, compensatory damages for identity theft, fraud, and time spent, reimbursement of out-of-pocket costs, adequate credit monitoring services funded by Defendant, and injunctive relief including improvements to Defendant's data security systems and practices to ensure they have reasonably sufficient security practices to safeguard patients' Private Information that remains in Defendant's custody to prevent incidents like the Data

Breach from reoccurring in the future.

21.    As a direct and proximate result of Defendant's wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class members' Private Information, Plaintiff has incurred (and will continue to incur) economic damages, and other actual injury and harm, in the form of (i) actual identity theft or identity fraud; (ii) the untimely and/or inadequate notification of the Data Breach; (iii) unauthorized disclosure of their Private Information; (iv) breach of the statutorily-protected confidentiality of their Private Information; (v) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud caused by the Data Breach; (vi) the value of their time spent mitigating the impact of the Data Breach and mitigating increased risk of identity theft and/or identity fraud; (vii) deprivation of the value of their Private Information, for which there is a well-established national and international market; and (viii) the impending, imminent, and ongoing increased risk of future identity theft, identity fraud, economic damages, and other actual injury and harm.

## II.    JURISDICTION

22.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million, exclusive of interest and costs, Defendant does business nationwide in over six states, including Florida, California, Texas, Nevada, Arizona, and Utah, and members of the proposed class, including Plaintiff, are citizens of different states than Defendant. Thus, minimal

diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23.     This Court has personal jurisdiction over Wound Technology Network, Inc. because it is incorporated in, maintains its principal place of business in, and/or regularly conducts business in this District.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Wound Tech resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. Moreover, Wound is domiciled in this District, is believed to maintain Plaintiff's and Class members' Private Information from this District, and has caused harm to Plaintiff and Class members in this District.

### III.    PARTIES

**A.    Plaintiff Ricardo Uribe**

25.     Plaintiff Ricardo Uribe is a resident and citizen of the State of California. Plaintiff Uribe was a patient of Wound Tech and otherwise received medical services from Wound Tech. In exchange for these services, Plaintiff Uribe provided his Private Information to his medical providers who Plaintiff Uribe understands, in turn, provided that information to Defendant Wound Tech. Plaintiff Uribe believed, at the time of receiving services from Defendant, that they would maintain the privacy and security of his Private Information. Plaintiff Uribe further believes he paid a premium to Wound Tech for their data security, and he would not have used Wound Tech's services or provided his Private Information to Wound Tech had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized

parties. On or about February 2, 2023, Plaintiff Uribe learned of the Data Breach and believes his Private Information may have been acquired by unauthorized parties during the Data Breach. Based on information and belief, these unauthorized parties accessed and viewed Plaintiff Uribe's Private Information. As a result of the Data Breach and Defendant's actions, Plaintiff Uribe has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendant's Data Breach.

**B.    Defendant Wound Technology Network, Inc.**

26.    Defendant Wound Technology Network, Inc. is a corporation with its principal place of business in Orlando, Florida.

27.    Wound Tech provides specialized wound care services through coordinated care with advanced practitioners and referring providers, allowing Wound Tech to deliver integrated, in-home wound treatment and standardized clinical practices at scale.

28.    Wound Tech operates a nationwide specialized wound care platform that provides advanced treatment for complex and chronic wounds. Wound Tech delivers care through a network of licensed advanced practitioners, including nurse practitioners, physician assistants, and podiatrists, and coordinates with referring physicians, health plans, and care facilities to provide integrated, in-home wound care services across multiple states.

29.    Wound Tech provides services in a wide range of locations, including over 50% of Florida, the three largest cities in Texas, Las Vegas, Nevada, Southern

California, and select areas in Arizona and Utah.

## IV.    FACTUAL ALLEGATIONS

### A.    Wound Tech's Business

30.    Wound Tech is a healthcare services company that provides specialized wound care to patients across multiple U.S. states.

31.    Wound Tech specializes in advanced wound care services, including the evaluation, treatment, and management of complex and chronic wounds, and coordinates care with referring physicians, health plans, and other healthcare providers.

32.    Wound Tech operates extensively within Florida, California and other states, where it collaborates with healthcare providers and facilities to deliver coordinated, hands-on wound care services aimed at improving patient outcomes.

33.    Wound Tech delivers care through a distributed workforce of licensed clinicians and utilizes centralized operational and technological resources to support its clinical services and care coordination.

34.    Wound Tech collected and stored Plaintiff's and Class members' most sensitive and private information, including, but not limited to, patient names; dates of birth, medical record numbers, Social Security numbers, along with multiple other identifiers and detailed PHI, including referral documents and complete medical records.

35.    Plaintiff and Class members relied on Wound Tech to keep their Private Information confidential and securely maintained, to use this information for legitimate

healthcare and business purposes only, and to make only authorized disclosures. Plaintiff and Class members reasonably believed Wound Tech would implement adequate security measures to safeguard their PII and PHI.

36.    Defendant had a duty to adopt and maintain reasonable administrative, technical, and physical measures to protect Plaintiff's and Class members' PII and PHI from unauthorized access, disclosure, or involuntary dissemination to third parties.

**B.    The Data Breach**

37.    Based on information and belief, in or about late January or early February 2026, unauthorized third parties accessed, viewed, and copied Plaintiff's and Class members' Private Information that was maintained by Wound Tech and was thereafter offered for distribution or sale online.

38.    As of the filing of this Complaint, Wound Tech has not provided Plaintiff or other affected patients with notice of the Data Breach, nor has it disclosed when the breach occurred, how long unauthorized access persisted, or the full scope or categories of information that were compromised.

39.    Instead, information concerning the Data Breach became publicly known through third-party cybersecurity reporting and disclosures attributed to the threat actors themselves, who claimed responsibility for the attack and asserted that they had exfiltrated large volumes of Wound Tech patient data.

40.    On information and belief, the threat actors released or shared sample datasets to substantiate their claims, demonstrating possession of authentic Wound

Tech patient data derived from Wound Tech's systems. The sample data included sensitive patient information, including but not limited to patient names, dates of birth, medical record numbers, Social Security numbers, along with multiple other identifiers and detailed PHI, including referral documents and complete medical records.

41.     Plaintiff's and Class members' unencrypted information may end up for sale on the dark web if it has not already, or simply fall into the hands of companies that will use the detailed PII and PHI for targeted marketing without the approval of Plaintiff and Class members. Unauthorized individuals can easily access and view the PII and PHI of Plaintiff and Class members.

42.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class members, causing their PII and PHI to be exposed to unauthorized access, viewing, and acquisition by unauthorized third parties.

43.     According to public reports, the Data Breach "reportedly affects over 160,000 patients and nearly 3,000 employees. The compromised data is comprehensive and severe, containing Full Names, Social Security Numbers (SSNs), Dates of Birth, Clinical Notes, Insurance Records, and deeply personal Graphic Wound Photographs. The attackers claim to have gained access via poorly secured S3 Buckets and credentials exposed in unencrypted Terraform state files, demonstrating a significant failure in

cloud security hygiene."[4]

44.    The Data Breach, as a breach of a specialized healthcare provider, carries

unique risks that go beyond standard medical identity theft:

- The "Visual Privacy" Violation: The leak of Wound Photographs is a distressing violation of patient dignity. Unlike text records, these images are visually identifying and sensitive. Threat actors can use them for Medical Extortion, threatening to publish graphic images of patients unless a ransom is paid, or sell them to niche "gore" communities on the dark web.

- Infrastructure as Code (IaC) Risk: The exposure of credentials via Terraform state files is a "Tier 1" DevOps failure. State files often contain plaintext secrets if not properly handled. This allowed attackers not just to view data, but to achieve Lateral Movement, pivoting from a development environment to production databases.

- Full Identity Cloning: The combination of SSNs, Medical Records, and Insurance IDs allows for "Medical Identity Theft." Criminals can use this data to undergo expensive surgeries or obtain prescription drugs in the victim's name, leaving the patient with massive bills and a corrupted medical history that could lead to life-threatening misdiagnoses later.

- Regulatory Fallout (HIPAA): This incident is a textbook HIPAA violation. The scale (160k users) and the nature of the negligence (unsecured S3 buckets) will likely attract severe fines from the Office for Civil Rights (OCR) and potential class-action lawsuits.[5]

## C.    Personally Identifiable Information/Protected Health Information

45.    PII and PHI, otherwise referred to herein as Private Information, is of

great value to hackers and cyber criminals, and the data compromised in the Data

---

[4] Brinztech Alert: The Alleged Documents of WoundTech are Leaked, Brinztech (Feb. 2, 2026), https://www.brinztech.com/breach-alerts/brinztech-alert-the-alleged-documents-of-woundtech-are-leaked/ (last visited Feb. 4, 2026).

[5] *Id.*

Breach can be used in a variety of unlawful manners.

46.    Private Information is information that can be used to distinguish, identify, or trace an individual's identity, *inter alia*: Social Security number, biometric records. This identification can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as birthdate, birthplace, and mother's maiden name.

47.    Private Information exceeds data that can be used to directly identify or contact an individual (*e.g.*, name, address, and phone number), or personal data that is especially sensitive (*e.g.*, Social Security number, diagnosis and treatment information, laboratory test results, prescription data, radiology reports, Medicare ID number, and health plan member number).

48.    PHI—like the type disclosed in the breach—is particularly valuable for cybercriminals. According to the Ponemon Institute and Verizon Data Breach Investigations Report, the health care industry experiences more data breaches than any other sector.[6] While regular PII can be sold at a price ranging from $40 to $200, and bank details sold at a price range of $50 to $200,[7] PHI can sell for as much as $363,

---

[6]    Center for Internet Security, *Data Breaches: In the Healthcare Sector*, <https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector> [as of February 4, 2026].

[7]    Digital Trends, *Your personal data is for sale on the dark web. Here's how much it costs,* (Oct. 16, 2019), <https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/> [as of February 4, 2026].

according to the Infosec Institute.[8] This is because one's personal health history cannot be changed, unlike more dynamic information such as credit card numbers and security codes.

49. The healthcare industry in particular has experienced a large and growing number of high-profile cyberattacks. Indeed, an analysis of data breaches recorded on the Privacy Rights Clearinghouse database between 2015 and 2019 showed that 76.59% of all recorded data breaches were in the healthcare sector. This implies the healthcare sector recorded three times as many data breaches as the education, finance, retail, and government sectors combined.[9]

50. According to analysis performed by U.S. Department of Health and Human Services ("HHS"), 45 million people in 2021 were affected by healthcare cyberattacks, triple the 14 million affected in 2018.[10] In 2022, HHS posted an alert warning healthcare organizations of an "exceptionally aggressive" ransomware group that is known to target the healthcare center, and noted that healthcare organizations should try to protect themselves with continuous monitoring and an active vulnerability

---

[8]    Center for Internet Security, *Data Breaches: In the Healthcare Sector*, <https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector> [as of February 4, 2026].

[9]    HIPAA Journal, *Healthcare Data Breach Statistics*, <https://www.hipaajournal.com/healthcare-data-breach-statistics/>, [as of February 4, 2026].

[10]    Healthcare Dive, *Tenet says 'cybersecurity incident' disrupted hospital operations*, <https://www.healthcaredive.com/news/tenet-says-cybersecurity-incident-disrupted-hospital-operations/622692/> [as of February 4, 2026].

management program.[11] The alert also suggested keeping backups of data in multiple locations and using two-factor authentication with strong passwords.

51.     According to a TENABLE study conducted over a 14-month period, a "root cause was reported in 93.17% of the healthcare breaches disclosed in the 14-month period [it] analyzed. Among these, ransomware was by far the most prominent root cause of healthcare breaches, accounting for a whopping 54.95%. Other leading causes included email compromise/phishing (21.16%), insider threat (7.17%) and unsecured databases (3.75%)."[12]

52.     In a survey released by Ponemon Institute in January 2023, nearly half of respondents (47%) said their organizations experienced a ransomware attack in the past two years, up from 43% in 2021. 45% of those respondents reported complications from medical procedures due to ransomware attacks, up from 36% in 2021.[13]

53.     In light of several recent high profile cybersecurity incidents affecting the healthcare industry, including the American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients,

---

[11] Healthcare Dive, *HHS warns providers of 'exceptionally aggressive' ransomware group*, < https://www.healthcaredive.com/news/hhs-warns-providers-of-exceptionally-aggressive-ransomware-group/622470/> [as of February 4, 2026].

[12]     TENABLE, *Root Cause Analysis of Healthcare Breaches*, < https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches>, [as of February 4, 2026].

[13] Chief Healthcare Executive, California medical group discloses ransomware attack, more than 3 million affected, <https://www.chiefhealthcareexecutive.com/view/california-medical-group-discloses-ransomware-attack-more-than-3-million-affected>, [as of February 4, 2026].

December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that their electronic records would be targeted by cybercriminals

54.    Given the nature of the Data Breach, it is foreseeable that the compromised Private Information will be used to access Plaintiff's and the Class members' other accounts, thereby providing access to additional Private Information or personal and sensitive information. Therefore, the compromised Private Information in the Data Breach is of great value to hackers and unauthorized users and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and unauthorized users. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[14] For example, different Private Information elements from various sources may be linked in order to identify an individual, or access additional

---

[14] Fed. Trade Comm'n, Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report 35-38 (Dec. 2010) <https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-preliminary-ftc-staff-report-protecting-consumer/101201privacyreport.pdf> [as of February 4, 2026].

information about or relating to that individual.

55.    Further, as technology advances, computer programs may scan the Internet with an ever-widening scope to create a mosaic of information that may be used to link information to an individual in ways not previously possible. This is known as the "mosaic effect."[15]

56.    Names and dates of birth, combined with contact information like telephone numbers and addresses, are very valuable to hackers and identity thieves as these items allow them to access users' other accounts, particularly when those users have easily decrypted passwords or security questions.

57.    The Private Information that Defendants exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in victims' names, obtaining protected health information, and/or committing medical fraud.

58.    Unfortunately, for Plaintiff and Class members, a person whose Private Information has been compromised may not fully experience the effects of the breach for years to come:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent

---

[15]    Fed. Chief Information Officers Council, Recommendations for Standardized Implementation of Digital Privacy Controls (Dec. 2012) pp. 7-8.

use of that information may continue for years. As a
result, studies that attempt to measure the harm resulting
from data breaches cannot necessarily rule out all future
harm.[16]

59.    Accordingly, Plaintiff and Class Members will bear a heightened risk of
injury for years to come. Identity theft is one such risk and occurs when an individuals'
Private Information is used without his or her permission to commit fraud or other
crimes.

60.    According to the Federal Trade Commission, "the range of privacy-
related harms is more expansive than economic or physical harm or unwarranted
intrusions and that any privacy framework should recognize additional harms that might
arise from unanticipated uses of data."[17]

**D.    The U.S. Department of Health and Human Services**

61.    Plaintiff's and Class members' Private Information is "protected health
information" as defined by 45 CFR § 160.103.

62.    Pursuant to 45 CFR § 164.408(a), Breach Reports are filed with the
Secretary of the U.S. Department of Health and Human Services "following the
discovery of a breach of unsecured protected health information."

---

[16] G.A.O., Personal Information: Data Breaches are Frequent, but Evidence of Resulting
Identity Theft is Limited; However, the Full Extent is Unknown (June 2007)
<https://www.gao.gov/assets/gao-07-737.pdf.> [as of February 4, 2026].
[17] Fed. Trade Comm'n, Protecting Consumer Privacy in an Era of Rapid Change (March 2012)
<https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-
report-protecting-consumer-privacy-era-rapid-change-
recommendations/120326privacyreport.pdf> [as of February 4, 2026].

63.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

64.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

65.    Plaintiff's and Class members' Private Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

66.    As a result of the Data Breach, Plaintiff's and Class members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E.

67.    As a result of the Data Breach, Plaintiff's and Class members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

68.    As a result of the Data Breach, Plaintiff's and Class members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

69. It is reasonable to infer that as a result of the Data Breach Plaintiff's and Class members' unsecured protected health information that was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

70. It should be rebuttably presumed that unsecured protected health information acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

71. After learning of the Data Breach, it is reasonable for Plaintiff and Class members to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

**E. Defendant Acquires, Collects, and Stores Plaintiff's and Class members' Private Information**

72. Defendant acquired, collected, and stored Plaintiff's and Class members' Private Information.

73. As a condition of its relationships with Plaintiff and Class members, including through its affiliates, Defendant required that Plaintiff and Class members entrust Defendant with highly confidential PII and PHI.

74. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII and PHI from disclosure.

75.    Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their PII and PHI and relied on Defendant to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

76.    Defendant acknowledges that it obtains, stores, and transmits a substantial amount of personal, financial, and medical information from individuals and/or patients.

**E.    The Healthcare Sector is Particularly Susceptible to Cyberattacks.**

77.    Defendant was on notice that companies in the healthcare industry were targets for cyberattacks.

78.    Defendant was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[18]

79.    The American Medical Association ("AMA") has also warned healthcare

---

[18] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014),    https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820    (last    visited February 4, 2026).

companies about the importance of protecting their patients' Private Information:

80.    Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[19]

81.    The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[20] In 2017, a new record high of 1,579 breaches were reported representing a 44.7 percent increase.[21] That trend continues.

82.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[22] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the

---

[19] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med.    Ass'n    (Oct.    4,    2019),    https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited February 4, 2026).

[20] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at:* https://www.idtheftcenter.org/surveys-studys (last accessed Sept. 18, 2020).

[21] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review, available at:* https://www.idtheftcenter.org/2017-data-breaches/ (last accessed February 4, 2026).

[22] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Sept. 18, 2020).

"average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[23] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[24]

83.    Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[25] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much

---

[23] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed February 4, 2026).

[24] *Id.*

[25] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himss-cybersecurity-survey (last accessed Sept. 18, 2020).

monetizable information stored in their data centers."[26]

**F.    Data Breaches are Foreseeable and Preventable**

84.    Data breaches are preventable. As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."

85.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

---

[26] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed February 4, 2026).

86.    In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

87.    Additionally, as companies, including Defendant, became more dependent on computer systems to run their business, *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.

88.    At all relevant times, Defendant knew, or reasonably should have known, the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

89.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

### G.    Securing PII and PHI and Preventing Breaches

90.    Defendant could have prevented this Data Breach by properly securing and encrypting the Private Information of Plaintiff and Class members. Alternatively, Defendant could have destroyed the data of former patients.

91.    Defendant's negligence in safeguarding the Private Information of Plaintiff and Class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

92.    Despite the prevalence of public announcements of data breach and data security compromises, especially in the healthcare context, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from being compromised.

93.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[27] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification

---

[27] 17 C.F.R. § 248.201 (2013).

number."[28]

94.    The ramifications of Defendant's failure to keep secure the PII and PHI of Plaintiff and Class members are long lasting and severe. Once PII and PHI is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is an imminent and impending threat of injury that continues for years.

95.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[29]

96.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent

---

[28] *Id*.

[29] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited February 4, 2026).

email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as

temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[30]

97.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- "**Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone

---

[30] *Id.* at 3-4.

you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new

Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic…."[31]

98.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  -    Apply latest security updates

  -    Use threat and vulnerability management

  -    Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  -    Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

  -    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[31] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Nov. 11, 2021).

- **Build credential hygiene**

  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities

  - Hunt for brute force attempts

  - Monitor for cleanup of Event Logs

  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall

  - Enable tamper protection

  - Enable cloud-delivered protection

  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[32]

99.    Given that Defendant was storing the Private Information of more than 100,000 individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

100.    The occurrence of the Data Breach indicates that Defendant failed to

---

[32] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited February 4, 2026).

adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Private Information of more than 100,000 individuals, including Plaintiff and Class members.

## H.    The Value of Private Information and the Effects of Unauthorized Disclosure.

101.    At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class members is highly sensitive and of significant value to those who would use it for wrongful purposes.

102.    Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[33] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

103.    While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[34]

104.    PHI is particularly valuable because criminals can use it to target victims

---

[33] Federal Trade Commission, *What to Know About Identity Theft, available at:* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed February 4, 2026).

[34] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Apr. 21, 2020).

with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

105.    Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[35]

106.    Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

107.    The ramifications of Defendant's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[35] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 7 , 2020).

Fraudulent activity might not show up for six to 12 months or even longer.

108.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

109.    Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened. [36] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[37]

110.    Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[38] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced

---

[36] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last accessed February 4, 2026).

[37]  Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accesses Sept. 7, 2020).

[38]  Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://notified.idtheftcenter.org/s/resource (last accessed Sept.7, 2020).

to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[39] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[40]

111.    As a healthcare provider, Defendant knew, or should have known, the importance of safeguarding its patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Defendant's patients as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

112.    The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant

---

[39] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed February 4, 2026); *see also*, National Survey on Medical Identity Theft, Feb. 22, 2010, cited at p. 2.

[40] *Id.*

evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[41] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[42] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information of Plaintiff and Class members that were misused.

113.    Further, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

114.    Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use

---

[41] Fed. Trade Comm'n, Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report 35-38 (Dec. 2010), *available at*: https://www.ftc.gov/sites/default/files/documents/ reports/federal-trade-commission-bureau-consumer-protection-preliminary-ftc-staff-report-protecting-consumer/101201privacyreport.pdf (as of February 4, 2026).

[42] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

Plaintiff's and Class members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

115.    The Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

## I.    Defendant's Conduct Violates HIPAA.

116.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[43]

117.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

118.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also

---

[43] HIPAA Journal, *What is Considered Protected Health Information Under HIPAA?*, *available at:* https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed February 4, 2026).

required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[44]

119.    Based on information and belief, Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Defendant's security failures include, but are not limited to, the following:

   a.  Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, stores and transmits in violation of 45 C.F.R. §164.306(a)(1);

   b.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

   c.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

   d.  Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents

---

[44]    Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited February 4, 2026).

that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f.  Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.  Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i.  Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

**J. Defendant Failed to Comply with FTC Guidelines**.

120. Defendant was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

121. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[45]

122. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for

---

[45] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed February 4, 2026).

businesses.[46] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

123.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[47]

124.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

125.    Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against

---

[46] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed February 4, 2026).

[47] FTC, *Start With Security*, *supra* note 16.

unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

126.    Defendant was at all times fully aware of its obligation to protect the Private Information of patients because of its position as a trusted healthcare provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**K.    Defendant Failed to Comply with Healthcare Industry Standards.**

127.    HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[48]

128.    HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

129.    Private cybersecurity firms have also identified the healthcare sector as

---

[48]    HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last accessed February 4, 2026).

being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[49] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

130. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Defendant chose to ignore them. These best practices were known, or should have been known by Defendant, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

**L.    Plaintiff and Class members Suffered Damages**

131. The ramifications of Defendant's failure to keep patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[50]

---

[49] *See e.g.,* INFOSEC, *10 Best Practices For Healthcare Security, available at:* https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last accessed Sept. 7, 2020).

[50] *2014 LexisNexis True Cost of Fraud Study, available at:* https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed Sept. 7, 2020).

132.    In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

133.    Defendant further owed and breached its duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

134.    As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members Private Information as detailed above, and Plaintiff are now at a heightened and increased risk of identity theft and fraud.

135.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In

rare cases, they may even be arrested for crimes they did not commit.

136.    Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

137.    Plaintiff and Class members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Defendant and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

138.    As a result of the Data Breach, Plaintiff's and Class members' Private Information has diminished in value.

139.    The Private Information belonging to Plaintiff and Class members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff'' or Class members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

140.    Plaintiff's and Class members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing, particularly scam marketing which several Plaintiff has experienced, without the approval of Plaintiff and Class members. Due to the Data Breach, unauthorized individuals can easily access the Private Information of Plaintiff

and Class members.

141.    The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class members' Private Information from unauthorized access, use, viewing, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

142.    Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

143.    Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class members' Private Information.

144.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as

work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

145.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[51]

146.    Defendant's failure to adequately protect Plaintiff's and Class members' Private Information has resulted in Plaintiff and Class members having to undertake numerous tasks to protect their information, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendant sit by and do nothing to assist those affected by the incident.

147.    Defendant has yet to offer any form of identity monitoring to Plaintiff and other Class members. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's

---

[51] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed February 4, 2026).

Private Information) – it does not prevent identity theft.[52] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

148.    Plaintiff and Class members have been damaged in several other ways as well. All Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Certain Plaintiff and/or Class members have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.

149.    The Private Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private

---

[52] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited February 4, 2026).

Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

150.    As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

    a.  The compromise, publication, theft and/or unauthorized use of their Private Information;

    b.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    c.  Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    d.  The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fail to undertake appropriate measures to protect the Private Information in their possession;

e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members; and

f. Anxiety and distress resulting from fear of misuse of their Private Information.

151. In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

## M. Defendant's Delay in Identifying & Reporting the Breach Caused Additional Harm

152. It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[53]

153. Indeed, once a data breach has occurred:

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills, insurance invoices, and suspicious emails. It can

---

[53] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire¸ *available at:* https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last accessed Sept. 7, 2020).

> prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).[54]

154.    As of the filing of this Complaint, Defendant has yet to provide notice of the Data Breach.

155.    As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class members has been driven even higher.

## V.    CLASS ALLEGATIONS

156.    Plaintiff brings this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

157.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class: All individuals whose Private Information was compromised in the Data Breach which became publicly known in or around February 2026.**

158.    In addition to the Nationwide Class, Plaintiff seeks certification of the following state Subclass:

---

[54] Consumer Reports, *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, January 31, 2019, *available at:* https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed February 4, 2026).

**California Subclass: All persons residing in California whose Private Information was compromised in the Data Breach which became publicly known in or around February 2026.**

159. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

160. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

161. Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class and state Subclass ("Classes") are so numerous that joinder of all members is impracticable. Based on information and belief, Defendant have over 160,000 patients whose Private Information may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendant's records.

162. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class members. These include:

a.      Whether and when Defendant actually learned of the Data Breach and whether their response was adequate;

b.      Whether Defendant owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their Private Information;

c.      Whether Defendant breached that duty;

d.      Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff's and Class members' Private Information;

e.      Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class members' PII/PHI;

f.      Whether Defendant knew or should have known that they did not employ reasonable measures to keep Plaintiff's and Class members' PII/PHI secure and prevent loss or misuse of that Private Information;

g.      Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.      Whether Defendant caused Plaintiff's and Class members' damages;

i.      Whether Defendant violated the law by failing to promptly notify Class members that their Private Information had been compromised;

j.      Whether Plaintiff and the other Class members are entitled to actual damages, credit monitoring, and other monetary relief;

     k.    Whether Defendant violated the California Unfair Competition Law (Business & Professions Code § 17200, *et seq*.); and

     l.    Whether Defendant violated the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq*.).

163.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

164.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

165.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical

of other Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

166.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

167.    The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could

unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

168.    Defendant is based in Orlando Florida, and on information and belief, all managerial decisions emanate from there, the representations on Defendant's website originate from there, Defendant's misrepresentations originated from Florida, and therefore application of Florida law to the Nationwide Class is appropriate.

169.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

170.    Adequate notice can be given to Class members directly using information maintained in Defendant's records.

171.    Unless a Class-wide injunction is issued, Plaintiff and Class members remain at risk that Defendant will continue to fail to properly secure the Private Information of Plaintiff and Class members resulting in another data breach, continue to refuse to provide proper notification to Class members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

172. Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

173. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

b. Whether Defendant owed a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

f. Whether Class members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

**(On Behalf of Plaintiff and the Class)**

174.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

175.    As a condition of receiving services, Plaintiff and Class members were obligated to provide Defendant directly, or through their affiliates, with their Private Information.

176.    Plaintiff and Class members entrusted their Private Information to Defendant with the understanding that Defendant would safeguard their information.

177.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would suffer if the Private Information were wrongfully disclosed.

178.    Defendant had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing its security protocols to ensure that Private Information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on relevant cybersecurity measures.

179.    Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and Class members, the critical importance of providing adequate security of that Private Information, the current cyber scams being perpetrated, and that they had inadequate employee training and education and IT security protocols in place to secure the Private Information of Plaintiff and Class members.

180.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class members. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the Private Information of Plaintiff and Class members.

181.    Plaintiff and Class members had no ability to protect their Private Information that was in Defendant's possession.

182.    Defendant were in a position to protect against the harm suffered by Plaintiff and Class members as a result of the Data Breach.

183.    Defendant had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiff's and Class members' Private Information.

184.    Defendant have admitted that Plaintiff's and Class members' Private

Information was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

185.    Defendant, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class members' Private Information while it was within Defendant's possession or control.

186.    Defendant improperly and inadequately safeguarded Plaintiff's and Class members' Private Information in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

187.    Defendant, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of its Plaintiff's and Class members' Private Information.

188.    Defendant, through their actions and/or omissions, unlawfully breached their duty to adequately disclose to Plaintiff and Class members the existence and scope of the Data Breach.

189.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff's and Class members' Private Information would not have been compromised and/or subsequently misused by unauthorized third parties to engage in fraudulent activity further harming Plaintiff and Class members.

190.   There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the Private Information and the harm suffered, or risk of imminent harm suffered, by Plaintiff and the Class.

191.   As a result of Defendant's negligence, unauthorized parties acquired Plaintiff's Private Information and used that specific information to harm Plaintiff and Class members as described above. As a further result of Defendant's negligence, Plaintiff and Class members have suffered and will continue to suffer damages and injury including, but not limited to, (a) actual identity theft; (b) an increased risk of identity theft, fraud, and/or misuse of their Private Information; (c) the loss of the opportunity of how their Private Information is used; (d) the compromise, publication, and/or theft of their Private Information; (e) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (f) diminished value of the Private Information; (g) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (h) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (i)

63

future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

192.    Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

193.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

194.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class members' Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class members.

195.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

196.   Plaintiff and Class members are within the class of persons that the FTC Act was intended to protect.

197.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class members.

198.   Defendant's violation of HIPAA also independently constitutes negligence *per se*.

199.   HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

200.   Plaintiff and Class members are within the class of persons that HIPAA privacy laws were intended to protect.

201.   The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

202.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to an increased risk of identity theft, fraud, and/or misuse of their Private Information and damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

203.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

## COUNT II
## INVASION OF PRIVACY

**(On Behalf of Plaintiff and the Classes)**

204.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

205.    Plaintiff and Class members reasonably expected that their Private

Information would be protected and secured from unauthorized parties, would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

206.  Defendants unlawfully invaded the privacy rights of Plaintiff and the Class by (a) failing to adequately secure their Private Information from disclosure to unauthorized parties for improper purposes; (b) disclosing their Private Information to unauthorized parties in a manner that is highly offensive to a reasonable person; and (c) disclosing their Private Information to unauthorized parties without the informed and clear consent of Plaintiff and the Class.

207.  In failing to adequately secure Plaintiff's and Class members' Private Information, Defendants acted in reckless disregard of their privacy rights. Defendants knew or should have known that their substandard data security measures are highly offensive to a reasonable person in the same position as Plaintiff and Class members.

208.  Defendants violated Plaintiff's and Class members' right to privacy under the common law and state constitutions, including, but not limited to, the Article I, Section I of the California Constitution.

209.  As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and Class members' Private Information has been viewed or is at imminent risk of being viewed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiff and the Class have suffered injury as a result of Defendants' unlawful invasions of privacy and are entitled to appropriate relief.

210.  Plaintiff and Class members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class members.

### COUNT III
**BREACH OF CONTRACT**

**(On Behalf of Plaintiff and the Classes)**

211.  Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

212.  Plaintiff and other Class members entered into valid and enforceable express contracts with Defendant under which Plaintiff and other Class members agreed to provide their Private Information to Defendant, and Defendant agreed to their services for monetary compensation and, impliedly if not explicitly, agreed to protect Plaintiff's and other Class members' Private Information.

213.  These contracts include, but are not limited to, test requisition forms, patient signature cards, HIPAA authorization forms, and patient consent forms.

214.  To the extent Defendant's obligation to protect Plaintiff's and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant to implement data security adequate to safeguard and protect the confidentiality of Plaintiff's and other Class members' Private Information, including in accordance with HIPAA regulations; federal, state and local laws; and industry standards. No Plaintiff would have entered

into these contracts with Defendant without understanding that Plaintiff's and other Class members' Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

215.    A meeting of the minds occurred, as Plaintiff and other Class members agreed, among other things, to provide their Private Information to Defendant for which Defendant derive a monetary benefit, in exchange for Defendant's agreement to protect the confidentiality of that Private Information.

216.    Both the provision of Defendant's services and the protection of Plaintiff's and other Class members' Private Information were material aspects of Plaintiff's and other Class members' contracts with Defendant.

217.    Defendant's promises and representations described above relating to HIPAA, CMIA, and industry practices, and about Defendant's purported concern about their patients' privacy rights became terms of the contracts between Defendant and their patients, including Plaintiff and other Class members. Defendant breached these promises by failing to comply with HIPAA, CMIA, and reasonable industry practices.

218.    Plaintiff and Class members read, reviewed, and/or relied on statements made by or provided by Defendant and/or otherwise understood that Defendant would protect its patients' Private Information if that information were provided to Defendant.

219.    Plaintiff and Class members fully performed their obligations under the implied contract with Defendant; however, Defendant did not.

220.    As a result of Defendant's breach of these terms, Plaintiff and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure health services Defendant promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and other Class members have been put at increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take months if not years to manifest, discover, and detect.

221.    Plaintiff and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

### COUNT IV
### BREACH OF IMPLIED CONTRACT

**(On Behalf of Plaintiff and the Classes, in the Alternative to Count III)**

222.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

223.    Plaintiff and Class members were required to provide their Private

Information to Defendant as a condition of their use of Defendant's services. By providing their Private Information, and upon Defendant's acceptance of such information, Plaintiff and all Class members, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contracts concerning Defendant's services to be provided by Defendant to Plaintiff.

224.    These implied-in-fact contracts obligated Defendant to take reasonable steps to secure and safeguard Plaintiff's and other Class members' Private Information. The terms of these implied contracts are further described in the federal laws, state laws, and industry standards alleged above, and Defendant expressly assented to these terms in their Privacy Policy and other public statement described above.

225.    Plaintiff and Class members paid money, or money was paid on their behalf, to Defendant in exchange for services, along with Defendant's promise to protect their health information and other Private Information from unauthorized disclosure.

226.    In their written privacy policies, Defendant expressly promised Plaintiff and Class members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

227.    Defendant promised to comply with HIPAA standards and to make sure that Plaintiff's and Class Members Private Information would remain protected.

228. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information was Defendant's obligation to (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

229. Without such implied contracts, Plaintiff and Class Members would not have provided their Private Information to Defendant.

230. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant; however, Defendant did not.

231. Defendant breached the implied contracts with Plaintiff and Class Members by failing to conduct the following:

A. reasonably safeguard and protect Plaintiff's and Class Members Private Information, which was compromised as a result of the Data Breach;

B. comply with their promise to abide by HIPAA;

C. ensure the confidentiality and integrity of electronic protected health information that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R 164.306(a)(1);

D.      implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

E.      implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R 164.308(a)(1);

F.      identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii); and

G.      protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2).

232.   As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure health services Defendant promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and other Class members have been put at an increased risk of identity theft, fraud, and/or misuse of

their Private Information, which may take months if not years to manifest, discover, and detect.

## COUNT V
## UNJUST ENRICHMENT

### (On Behalf of Plaintiff and the Classes)

233.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

234.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

235.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

236.    The amounts Plaintiff and Class Members paid for goods and services were used, in part, to pay for use of Defendant's network and the administrative costs of data management and security.

237.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because

Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

238.    Defendant failed to secure Plaintiff's and Class Members Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

239.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

240.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to Defendant's services.

241.    Plaintiff and Class Members have no adequate remedy at law.

242.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) an increased risk of identity theft, fraud, and/or misuse of their Private Information; (c) the loss of the opportunity of how their Private Information is used; (d) the compromise, publication, and/or theft of their Private Information; (e) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (f) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover

from identity theft; (g) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (h) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

243.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

244.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class members overpaid for Defendant's services.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* –**
**UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES**

**(On Behalf of Plaintiff and the Classes, or,**
**alternatively, the California Subclass)**

245.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

246.    The California Unfair Competition Law, Cal. Bus. & Prof. Code sections

17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

247.    By reason of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiff and Class Members' Private Information, Defendant engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

248.    Defendant have violated Cal. Bus. and Prof. Code § 17200, *et seq.*, by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class.

249.    Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the Private Information of Plaintiff and Class Members has been compromised for unauthorized parties to see, use, and otherwise exploit.

250.    Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members Private Information also constitute "unfair" business acts and practices

within the meaning of Business & Professions Code sections 17200, *et seq*., in that Defendant's conduct was substantially injurious to Plaintiff and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

251.    Defendant engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members Private Information with knowledge that the information would not be adequately protected; by violating the California Confidentiality Of Medical Information Act, Cal. Civ. Code § 56, *et seq.*; by violating the other statutes described above; and by storing Plaintiff's and Class Members Private Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendant to take reasonable methods of safeguarding the Private Information of Plaintiff and the Class members.

252.    Defendant's practices were also unlawful and in violation of Civil Code sections 1798, *et seq.* and Defendant's own privacy policy because Defendant failed to take reasonable measures to protect Plaintiff's and Class Members Private Information and failed to take remedial measures such as notifying its users when it first discovered that their Private Information may have been compromised.

253.    In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).

254.    Defendant's business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the Private Information they provided to Defendant will remain private and secure, when in fact it has not been maintained in a private and secure manner, and that Defendant would take proper measures to investigate and remediate a data breach, when Defendant did not do so.

255.    Plaintiff and Class Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, *inter alia*, the unauthorized release and disclosure of their Private Information and lack of notice.

256.    But for Defendant's misrepresentations and omissions, Plaintiff and Class Members would not have provided their Private Information to Defendant, or would have insisted that their Private Information be more securely protected.

257.    As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendant for the services, the loss of Plaintiff's and Class Members legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described herein.

258.    Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members Private Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

259.    Plaintiff seeks prospective injunctive relief, including improvements to Defendant's data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Private Information that remains in Defendant's custody, including but not limited to the following:

a.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.    Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

d.    Ordering that Defendant segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to

other portions of Defendant's systems;

e.  Ordering that Defendant not transmit Private Information via unencrypted email;

f.  Ordering that Defendant not store Private Information in email accounts;

g.  Ordering that Defendant purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendant's services;

h.  Ordering that Defendant conduct regular computer system scanning and security checks;

i.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.  Ordering Defendant to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

260.  Unless such Class-wide injunctive relief is issued, Plaintiff and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff (and other consumers) can rely on Defendant's representations regarding its data security in the future.

261.  Furthermore, in the alternative to all legal remedies sought herein, Plaintiff, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code

§ 17200, *et seq.*, including, but not limited to, restitution to Plaintiff and Class Members of money or property that Defendant may have acquired by means of Defendant's unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendant because of Defendant's unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,**
**CAL. CIV. CODE § 56, *ET SEQ*.**

**(On Behalf of Plaintiff and the California Subclass)**

262.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

263.    At all relevant times, Defendant were health care providers because they had the "purpose of maintaining medical information to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis or treatment of the individual."

264.    Defendant are providers of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05.

265.    Plaintiff and Class Members are patients of Defendant, as defined in Civil Code § 56.05(k).

266.    Plaintiff and Class Members provided their personal medical information to Defendant.

267.    At all relevant times, Defendant collected, stored, managed, and transmitted Plaintiff's and Class Members personal medical information.

268.    As a provider of health care or a contractor, Defendant are required by the CMIA to ensure that medical information regarding patients is not disclosed or disseminated or released without patients' authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

269.    As a provider of health care or a contractor, Defendant are required by the CMIA not to disclose medical information regarding a patient without first obtaining an authorization under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35 and 56.104.

270.    As a provider of health care or a contractor, Defendant are required by the CMIA to create, maintain, preserve, and store medical records in a manner that preserves the confidentiality of the information contained therein under Civil Code §§ 56.06 and 56.101(a).

271.    As a provider of health care or a contractor, Defendant are required by the CMIA to protect and preserve confidentiality of electronic medical information of Plaintiff and the Class in its possession under Civil Code §§ 56.06 and 56.101(b)(1)(A).

272.    As a provider of health care or a contractor, Defendant are required by the CMIA to take appropriate preventive actions to protect the Private Information or records against release consistent with Defendant's obligations under the CMIA, under Civil Code § 56.36I(2)(E).

273.    Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

274.    As a result of the Data Breach, Defendant have misused, disclosed, and/or allowed third parties to access and view Plaintiff's and Class Members personal medical information without their written authorization compliant with the provisions of Civil Code §§ 56, *et seq*.

275.    The hacker or hackers who committed the Data Breach obtained Plaintiff's and Class Members personal medical information, viewed it, and now have it available to them to sell to others bad actors or otherwise misuse.

276.    As a further result of the Data Breach, the confidential nature of the Plaintiff's medical information was breached as a result of Defendant's negligence. Specifically, Defendant knowingly allowed and affirmatively acted in a manner that allowed unauthorized parties to access and actually view Plaintiff's and Class members' Private Information.

277.   Defendant's misuse and/or disclosure of medical information regarding Plaintiff and Class Members constitutes a violation of Civil Code §§ 56.10, 56.11, 56.13, and 56.26.

278.   As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care, Plaintiff's and Class Members personal medical information was disclosed without written authorization.

279.   By disclosing Plaintiff's and Class Members Private Information without their written authorization, Defendant violated California Civil Code § 56, *et seq*., and their legal duty to protect the confidentiality of such information.

280.   Defendant also violated Sections 56.06 and 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

281.   As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff's and Class Members personal medical information was viewed by, released to, and disclosed to third parties without Plaintiff's and Class Members written authorization.

282.   Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff and Class Members' medical information in a manner that preserved the confidentiality of the information contained therein violated

the CMIA, Cal. Civ. Code §§ 56.06 and 56.101(a). By Defendant's own admission, patients' confidential medical information contained in unencrypted emails and attachments has been accessed and viewed by an unauthorized third party or parties, and thus Defendant have negligently released medical information concerning Plaintiff and Class Members. Accordingly, Defendant's systems and protocols did not protect and preserve the integrity of electronic medical information in violation of the CMIA, Cal. Civ. Code § 56.101.

283.    As a direct and proximate result of Defendant's and/or its employees' above-described conduct in violation of the CMIA, Plaintiff and Class Members were injured and have suffered damages, as described above, from Defendant's illegal disclosure and/or negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and are therefore entitled to nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1); the amount of actual damages, if any, for each violation under Civil Code §56.36(b)(2); injunctive relief; and attorneys' fees, expenses, and costs.

## COUNT VIII
### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### CAL. CIV. CODE § 1750, *ET SEQ.*
### (On Behalf of Plaintiff and the California Subclass)

284.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

285.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq*. This cause of action does not seek monetary damages at this time but is limited solely to injunctive relief. Plaintiff will later amend this Complaint to seek damages in accordance with the CLRA after providing Defendants with notice required by California Civil Code § 1782.

286.    On or about February 4, 2026, Plaintiff sent Defendant notice pursuant to the CLRA. Defendant is the party with the most knowledge of the underlying facts giving rise to Plaintiff's allegations, so that any pre-suit notice would not put Defendant in a better position to evaluate those claims.

287.    Plaintiff and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

288.    Plaintiff, Class Members, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

289.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant was likely to deceive consumers.

290.    Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

291.    Defendant violated this provision by representing that it took appropriate measures to protect Plaintiff's and the Class Members' Private Information. Additionally, Defendant improperly handled, stored, or protected either unencrypted or partially encrypted data.

292.    Plaintiff and Class Members relied upon Defendant's representations and were induced to sign up for Defendant's services, and provide their Private Information which contains value in order to obtain services from Defendant.

293.    As a result, Plaintiff and Class Members were induced to enter into a relationship with Defendant and provide their Private Information.

294.    As a result of engaging in such conduct, Defendant have violated Civil Code § 1770.

295.    Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

296.    Plaintiff and Class Members suffered injuries caused by Defendant's misrepresentations, because they provided their Private Information believing that Defendant would adequately protect this information.

297.    Plaintiff and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

298.   The unfair and deceptive acts and practices of Defendant, as described above, present a serious threat to Plaintiff and Class Members.

299.   Plaintiff seeks prospective injunctive relief, including improvements to Defendant's data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Private Information that remains in Defendant's custody, including but not limited to the following:

a.   Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.   Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.   Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.   Ordering that Defendant segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.  Ordering that Defendant not transmit Private Information via unencrypted email;

f.  Ordering that Defendant not store Private Information in email accounts;

g.  Ordering that Defendant purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendant's services;

h.  Ordering that Defendant conduct regular computer system scanning and security checks;

i.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.  Ordering Defendant to meaningfully educate its current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

300.   Unless such Class-wide injunctive relief is issued, Plaintiff and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff (and other consumers) can rely on Defendant's representations regarding

its data security in the future.

301. As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access and disclosure. The California Legislature explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."

///

///

///

**COUNT IX**
**VIOLATION OF CALIFORNIA CONSUMER RECORDS ACT**
**CAL. CIV. CODE § 1798.80 *ET SEQ*.**

**(On Behalf of Plaintiff and the Classes, or, alternatively, the California Subclass)**

302. Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

303. Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to

any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

304. The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

305. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

a. The security breach notification shall be written in plain language;

b. The security breach notification shall include, at a minimum, the following information:

i. The name and contact information of the reporting person or business subject to this section;

ii. A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

iii. If the information is possible to determine at the time the notice is provided, then any of the following:

1. The date of the breach;

2. The estimated date of the breach; or

3. The date range within which the breach occurred. The notification shall also include the date of the notice.

iv. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

v. A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi. The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

306. The Data Breach described herein constituted a "breach of the security system" of Defendant.

307. As alleged above, Defendant unreasonably delayed informing Plaintiff and Class Members about the Data Breach, affecting their Personal and Medical Information, after Defendant knew the Data Breach had occurred.

308. Defendant failed to disclose to Plaintiff and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendant knew or reasonably believed such information had been compromised.

309. Defendant's ongoing business interests gave Defendant incentive to

conceal the Data Breach from the public to ensure continued revenue.

310.    Upon information and belief, no law enforcement agency instructed Defendant that timely notification to Plaintiff and Class Members would impede its investigation.

311.    As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and Class Members because their stolen information would have had less value to identity thieves.

312.    As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

313.    Plaintiff and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiff and Class Members as alleged above and equitable relief.

314.    Defendant's misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendant conducted with the intent on the part of Defendant of depriving Plaintiff and Class Members of "legal rights or otherwise causing injury." In addition, Defendant's

misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by Defendant with a willful and conscious disregard of the rights or safety of Plaintiff and Class Members and despicable conduct that has subjected Plaintiff and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiff and Class Members are entitled to punitive damages against Defendant under Cal. Civ. Code § 3294(a).

**COUNT X**
**INJUNCTIVE / DECLARATORY RELIEF**

**(On Behalf of Plaintiff and the Nationwide Class)**

315.    Plaintiff re-alleges and incorporates by reference paragraphs 1 to 173 of the Complaint as if fully set forth herein.

316.    This count is brought on behalf of all Classes.

317.    This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

318.    As previously alleged, Plaintiff and Class Members entered into an implied contract that required Defendant to provide adequate security for the Private Information they collected from Plaintiff and Class Members.

319.    Defendant owe a duty of care to Plaintiff and Class Members requiring them to adequately secure Private Information.

320.    Defendant still possesses Private Information regarding Plaintiff and Class Members.

321.    Since the Data Breach, Defendant have announced few if any changes to

its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent further attacks.

322.    Defendant have not satisfied their contractual obligations and legal duties to Plaintiff and Class Members. In fact, now that Defendant's insufficient data security is known to hackers, the Private Information in Defendant's possession is even more vulnerable to cyberattack.

323.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that lead to such exposure.

324.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

325.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing security measures do not comply with their contractual obligations and duties of care to provide adequate security, and (2) that to comply with their contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that Defendant segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Ordering that Defendant not transmit Private Information via unencrypted email;

f. Ordering that Defendant not store Private Information in email accounts;

g. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

h. Ordering that Defendant conduct regular computer system scanning and security checks;

i. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to

97

identify and contain a breach when it occurs and what to do in response to a breach; and

j. Ordering Defendant to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all members of the Classes, request judgment against the Defendant and that the Court grant the following relief:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the Classes requested herein;

B. Injunctive relief requiring Defendant to (1) strengthen its data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendant's systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C. An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D.  An award to Plaintiff and all members of the Classes of compensatory, consequential, incidental, nominal, and statutory damages, restitution, and disgorgement, in an amount to be determined at trial;

E.  That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law, including but not limited to the following:

   a.  Compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorneys' fees not to exceed one thousand dollars ($1,000), and the costs of litigation under Civil Code §56.35;

   b.  Nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1);

   c.  Actual damages suffered, according to proof, for each violation under Civil Code §56.36(b)(2);

   d.  Damages pursuant to Civil Code §§ 1798.84(b) and 1798.150;

   e.  Injunctive relief pursuant to Civil Code § 1798.84(e); and

   f.  All other damages, injunctive relief, attorneys' fees, expenses and costs permitted by law or statute.

F.  An award of credit monitoring and identity theft protection services to Plaintiff and all members of the Classes;

G.  An award of attorneys' fees, costs, and expenses, as provided by law or equity;

H.  An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

I.  An order requiring Defendant to pay pre-judgment and post-judgment

interest, as provided by law or equity; and

J.      Any such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right.

Dated: February 4, 2026                    Respectfully submitted,


 /s/ John A. Yanchunis
John A. Yanchunis
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
jyanchunis@ForThePeople.com


Daniel S. Robinson (*Pro Hac Forthcoming*)
Michael W. Olson (*Pro Hac Forthcoming*)
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiff Ricardo Uribe and the Proposed Class*